**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Allan Kenneth Morgal,<br><br>    Plaintiff,<br><br>vs.<br><br>Joseph Arpaio, et al.,<br><br>    Defendants. | No. CV 07-0670-PHX-RCB<br><br>**O R D E R** |

Plaintiff Allan Kenneth Morgal brought this civil rights action under 42 U.S.C. § 1983 against the Maricopa County Board of Supervisors (BOS) (Doc. 1). Before the Court is Defendant's third summary judgment motion, entitled "Renewed Motion for Summary Judgment" (Doc. 142), which Plaintiff opposes (Doc. 167).

The Court will deny Defendant's motion.

**I.    Background**

    **A.    Complaint**

Plaintiff's claim stems from his confinement as a detainee in the Maricopa County Fourth Avenue Jail and Lower Buckeye Jail in 2005-2006 (Doc. 1 at 1).[1] He alleged that Defendant's medical care policies at the jail exhibited deliberate indifference to Plaintiff's serious medical needs and violated his Fourteenth and Eighth Amendment rights (id. at 4,

---

[1] Plaintiff is currently confined in the Arizona State Prison Complex in Tucson, Arizona (Doc. 132).

4H-J).[2]

Plaintiff stated that in August 2005, he began trying to see a doctor for a respiratory infection (id. at 4A). He was repeatedly told by Correctional Health Services (CHS) that he was on the "sick call list," but he was never seen by medical (id. at 4-4A).[3] In December 2005, he instituted the inmate grievance process and was finally seen by medical on January 24, 2006, approximately 6 weeks after he submitted his inmate grievance (id. at 4-4B). Plaintiff claimed that as a result of the delay in treatment for his infection, he was coughing up blood and suffered splitting headaches, ringing ears, and a virus (id. at 4).

Plaintiff also alleged that he was denied high blood-pressure medication prescribed to him by a physician (id. at 4D). Plaintiff explained that since suffering a stroke in 2005, he has taken medication and he continued taking his medication in jail. But on March 17, 2006, he submitted a grievance stating that he had put in three written orders for his medication and inquired about it verbally at least 12 times but had gone without his medication for 10 days (id.). Plaintiff claimed that he ultimately asked for his medication at least 20 times, in writing and verbally (id. at 4E). Plaintiff eventually received his medication after going 19 days without it (id.). He claimed that as a result of the delay in obtaining medication, he suffered from high blood pressure, dizziness, and a constant headache (id. at 4H).

### B. Procedural

Plaintiff initiated this action in March 2007 (Doc. 1). Defendant first moved for summary judgment, along with two other named Defendants—the sheriff and a detention officer—in April 2008 (Doc. 37). On January 14, 2009, the Court granted summary

---

[2] Defendant BOS is a local governing body amenable to suit under § 1983 (Doc. 26 at 4). Monell v. Dep't of Social Servs. of New York, 436 U.S. 658, 691-94 (1978). The county is responsible for providing medical care to county jail inmates through its BOS (Doc. 26 at 4). See Ariz. Rev. Stat. § 11-291(A) (the BOS provides for the medical care of inmates in the county corrections agency).

[3] Throughout this Order, reference is made to CHS, which is the administrative subdivision or "medical department" within the jail that provides health services to inmates (see Doc. 1 at 2; Doc. 26 at 4 (actions against a county policy must be brought against the county or the BOS and not against an administrative subdivision)).

1  judgment to the sheriff and the detention officer but denied summary judgment as to the BOS
2  after finding material factual disputes whether medical policies at the jail caused delays in
3  healthcare that harmed Plaintiff (Doc. 52).

4       In April, 2009, the Court held a status hearing and set a trial date for August 2009
5  (Doc. 61).

6       Defendant then filed its second Motion for Summary Judgment (Doc. 92).  The Court
7  granted this second motion after finding that Plaintiff submitted evidence related solely to
8  his isolated treatment and failed to demonstrate that there existed a policy of denying medical
9  care or that Defendant regularly failed to provide adequate medical care to its detainees (Doc.
10 116).

11      Plaintiff filed an appeal to the Ninth Circuit Court of Appeals (Doc. 119).

12      On August 9, 2011, the Ninth Circuit issued its Mandate affirming summary judgment
13 for the sheriff and the detention officer and vacating summary judgment as to the BOS (Doc.
14 122).  The Ninth Circuit noted that summary judgment was issued on the ground that
15 Plaintiff failed to proffer sufficient evidence of a policy; however, at the time of the ruling,
16 there were five pending discovery submissions by Plaintiff (id., Mem. at 2-3).  In its
17 Memorandum, the Ninth Circuit referred to Plaintiff's submission of a February 24, 2006
18 report entitled "Revised Accreditation Report on the Health Care Services at Maricopa
19 County Sheriff's Office-Detention Bureau," which was authored by the National
20 Commission on Correctional Health Care (NCCHC) (id., Mem. at 3 n. 1).  The appellate
21 court record was supplemented to include this document for the purpose of identifying it as
22 the subject of Plaintiff's discovery submissions to the district court (id.).  Because pending
23 discovery motions by a party opposing summary judgment must be resolved before summary
24 judgment, summary judgment for the BOS was vacated and the matter was remanded (id. at
25 3).

26      Plaintiff then moved to re-open discovery on the basis that after obtaining the
27 NCCHC report, he learned of material facts about which he sought to conduct additional
28 depositions (Doc. 123).  The Court denied Plaintiff's motion to re-open discovery (Doc. 133),

- 3 -

1 as well as his subsequent motions for discovery and to amend his Complaint to add facts
2 (Docs. 134, 139-140, 144, 161, 173).

3 Defendant filed its Renewed Motion for Summary Judgment on March 22, 2012, and
4 the Motion is now ready for ruling (Doc. 142).

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. This initial burden on the movant, however, "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence . . . ." Id. at 325.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, or the movant can point to the pleadings and sufficiently argue that the nonmovant has failed to establish an element essential to his case, see Celotex 477 U.S. at 323, then the burden shifts to the nonmovant, who must come forward with sufficient evidence demonstrating to the Court that there are genuine issues of material fact to be decided at trial. Fed. R. Civ. P. 56(e). The opposing party must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not to weigh the evidence and

1    determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477

2    U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences

3    are to be drawn in his favor." Id. at 255. Although the court need consider only the cited

4    materials, it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Parties' Contentions**

    **A.   Defendant's Motion**

Defendant moves for summary judgment on the grounds that Plaintiff has failed to present evidence of an official policy, practice, or custom that was the moving force behind his claimed injuries and he has failed to present evidence that Defendant had the requisite knowledge of a constitutionally deficient policy, custom, or practice but failed to act (Doc. 142 at 2). Defendant asserts that the Court previously held that Plaintiff failed to submit evidence to support his policy claim, and, according to Defendant, the evidentiary record has not changed since that ruling, and "[t]his includes any reference Plaintiff might make to the so-called 2008 'NCCHC Report' regarding CHS which the Court already considered in reaching its original order granting Defendant's Motion for Summary Judgment" (id. at 5, citing Doc. 116 at 6). Defendant contends that for this reason, the Court should again grant summary judgment for the BOS (id. at 5).

Defendant states that its Renewed Motion is supported by its second Motion for Summary Judgment, the separate Statement of Facts filed in support of its first Motion for Summary Judgment, and "the Court's entire file in this matter" (Doc. 142 at 1, citing Docs. 92, 37).[4]

    **B.   Plaintiff's Response**

In response, Plaintiff argues that Defendant's motion fails to comply with any of the applicable Rules of Procedure (Doc. 166). He asserts that Defendant's Renewed Motion for Summary Judgment is past the dispositive-motions deadline set in the Scheduling Order and Defendant did not file a separate motion for leave (id. at 1). Plaintiff notes that the

---

[4]Defendant did not submit a separate statement of facts with its Renewed Motion for Summary Judgment as required under Local Rule of Civil Procedure 56.1(a), nor did Defendant submit any supporting documentary evidence.

- 5 -

1    procedural rules have been strictly applied to his requests for leave to file motions (id.).

2    Plaintiff next contends that Defendant attempts to mislead the Court by stating that
3    the "so-called 2008 NCCHC Report" has already been considered by the Court in its prior
4    summary judgment ruling (id. at 1-2). Plaintiff asserts that the Court could not have
5    previously considered the NCCHC Report—which is actually dated 2006—because Plaintiff
6    did not obtain it until January 2010 during his appeal (id. at 2).

7    Plaintiff argues that the Court has already found that he sufficiently alleged a serious
8    medical need (id., citing Doc. 52 at 11-12). He further argues that Defendant was put on
9    notice through numerous lawsuits and complaints, the loss of accreditation, and reports
10   issued by its own experts that the county delayed and denied medical care to inmates, and
11   Plaintiff alleges that, despite this knowledge, Defendant failed to take corrective actions (id.).
12   He adds that Defendant is liable for the resulting constitutional violations based on its
13   decision not to fund a record-keeping system and adequate staffing (id. at 3).

14   Although Defendant raised no such argument in its motion, Plaintiff asserts that the
15   physical-injury requirement set forth in the Prison Litigation Reform Act (PLRA), 42 U.S.C.
16   § 1997e(e), does not apply to his claim because he is not seeking damages for emotional or
17   mental injury; rather, he seeks compensation for a constitutional violation under the Eighth
18   Amendment (id. at 2-3).

19   In support of his opposition, Plaintiff submits a Statement of Disputed Facts, which
20   primarily sets forth legal arguments for Defendant's liability (Doc. 169 at 1-3, 8).[5] He also
21   submits his own affidavit, (id., Attach., Pl. Aff.), copies of correspondence with defense
22   counsel (Doc. 167, Ex. A), a transcript of the deposition of Dr. Todd Randall Wilcox taken
23   in Graves v. Arpaio, et al., No. CV 77-479-PHX-NVW (id., Ex. B, Wilcox Dep., June 28,

---

[5]Plaintiff also argues that Defendant failed to meet its discovery obligations and discovery was not completed; Plaintiff requests that he be allowed to take depositions or further discovery (Doc. 169 at 4). He also points to various examples of what he claims are evidence of defense counsel's attempts to deceive the Court, including misrepresentations of the report dates and of the evidence actually provided in discovery, and he lists documents he recently became aware of that he believes should have been disclosed (id. at 4-6, 8-10). Because the Court has already addressed his motions to re-open discovery, Plaintiff's pending request for discovery will be denied (see Docs. 133, 173).

- 6 -

2008); newspaper articles (id., Ex. C); a February 20, 2008 letter from Dr. Wilcox to the BOS (id., Ex. D); the copy of a returned mail notice (id., Ex. E); the copy of the first page of a February 20, 2006 letter from CHS to the NCCHC in response to the a draft of the 2006 NCCHC report (id., Ex. F); and a copy of CHS's handout on "The Common Cold" (id., Ex. G).

### C. Defendant's Reply

Defendant argues in reply that Plaintiff's claim is barred by the PLRA because he did not sustain a physical injury (Doc. 172 at 1, 3-4). Defendant further argues that, even if his claim is not barred, Plaintiff cannot show that a unlawful policy established by Defendant directly caused him injury (id.).

Defendant reasserts its claim that the factual and evidentiary record in this matter has not changed since the Court's prior grant of summary judgment and the Court already determined there was no evidence of a deliberately-indifferent policy that harmed Plaintiff (id. at 2-3, 5).

Defendant also argues that the Court should not consider the exhibits Plaintiff submitted in support of his opposition because none of those exhibits were disclosed during the discovery phase of this case (id. at 2, 6). Defendant states that it would be prejudiced if the Court considered the exhibits because Defendant had no opportunity to produce additional evidence or conduct discovery in response to these documents (id.). Defendant asserts that Plaintiff was required to seek Dr. Wilcox's deposition during the discovery period but he failed to do so and he should not be permitted to use such deposition evidence now (id. at 6-7). Finally, Defendant contends that the newspaper articles and the letter from Dr. Wilcox are hearsay and inadmissible (id. at 7).

## IV. Procedural and Evidentiary Issues

### A. Timeliness of Defendant's Motion

Plaintiff argues that Defendant's Renewed Motion for Summary Judgment was filed well after the dispositive-motions deadline and Defendant did not properly file a separate motion for leave to file its pending motion (Doc. 166). Federal Rule of Civil Procedure

6(b)(1) provides that if a filing deadline has expired, a request for an extension must be on a separate motion and the standard to be met is excusable neglect. Local Rule of Civil Procedure 7.3 requires a party seeking an extension to disclose any previous extensions and to lodge a separate proposed form of order.

Following remand by the Ninth Circuit, the district court did not issue a new scheduling Order or set a new dispositive-motions deadline. The procedural posture of the case, however, would have normally resulted in the Court setting a new deadline rather than proceeding directly to trial following resolution of the issues raised by the Ninth Circuit's Mandate. Accordingly, when Defendant filed its Renewed Motion for Summary Judgment, the Court issued a Rand Notice directing the parties to brief the motion and instructing that the motion would be ready for ruling following the date set for a reply filing (Doc.143). The Court therefore implicitly granted leave for the filing of the motion.

More importantly, because the Court herein denies Defendant's Renewed Motion, Plaintiff is not unduly prejudiced, and addressing the motion serves to clarify and narrow the issues for trial.

### B.     Plaintiff's Exhibits

#### 1.  Dr. Wilcox's Deposition

Defendant asserts that Dr. Wilcox's deposition from the Graves proceeding should not be considered because Plaintiff was required to seek such discovery during the established time period and it would constitute an "end-run" around the Court's prior Order which denied re-opening discovery to conduct depositions (Doc. 172 at 6-7).

Under Federal Rule of Civil Procedure 32, a deposition may not be used in court proceedings unless (1) the opposing party was present or represented at the taking of the deposition or had reasonable notice of it or (2) there is a ground for admission under Rule 32(a), such as for impeachment purposes or because the witness is unavailable. Fed. R. Civ. P. 32(a)(1)(A) and (2)-(8). But the Ninth Circuit has held that a deposition can be used to support or oppose a summary judgment motion if it meets the requirements for an affidavit under Rule 56, i.e., it is made on personal knowledge and sets out facts that would be

admissible in evidence. Fed. R. Civ. P. 56(c)(4); Hoover v. Switlik Parachute Co., 663 F.2d 964, 966 (9th Cir. 1981). This includes deposition testimony taken in a separate proceeding involving different parties. Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001).[6] Even an uncompleted, unsigned deposition is admissible under Rule 56 "[b]ecause there is no reason to believe that the sworn answers to questions are less reliable than an affidavit." In re Sunset Bay Assocs., 944 F.2d 1503, 1509-10 (9th Cir. 1991). Dr. Wilcox's deposition meets the Rule 56 requirements; it is sworn testimony based on personal knowledge, and it sets forth facts admissible in evidence (see Doc. 167, Ex. B, Wilcox Dep. 6:1-3). See Fed. R. Civ. P. 56(c)(4).

Defendant asserts, however, that it would be prejudiced if the Court considers the deposition because it was not previously disclosed and Defendant had no opportunity to produce evidence in response (Doc. 172 at 6). Yet Defendant provides no legal authority to support that at summary judgment, Plaintiff is limited to evidence that was disclosed during discovery. There is nothing in Rule 56 suggesting that affidavits used to oppose summary judgment must have been previously disclosed. See Fed. R. Civ. P. 56(c)(1)(A) and (4). Indeed, Dr. Wilcox's deposition was not taken until June 2008, which was after discovery in this matter closed (see Doc. 167, Ex. B, Wilcox Dep. at 1; Doc. 12). And Plaintiff avers that he did not obtain a copy of the deposition until just prior to filing his response memorandum (Doc. 169 at 9). Thus, there is no evidence that Plaintiff acted in bad faith in failing to disclose earlier that he sought to use Dr. Wilcox's testimony, nor is there evidence that Defendant was unaware of this testimony (see n. 7). Most importantly, this is Defendant's summary judgment motion; therefore, Defendant had the opportunity to file a reply and respond to any evidence proffered by Plaintiff, including Dr. Wilcox's testimony.

Accordingly, Dr. Wilcox's deposition testimony will not be used as a deposition under Rule 32 but it will be considered as an affidavit under Rule 56 in support of Plaintiff's

---

[6]The Court notes that the Graves defendants represented at Dr. Wilcox's deposition included the Sheriff and the Maricopa County Sheriff's Office; BOS Brock, Stapley, Kunasek, Wilson and Wilcox; and CHS (Doc. 167, Ex. B, Wilcox Dep. 4:13-25). See Graves, 77-479-PHX-NVW.

- 9 -

1 opposition.

### 2. Dr. Wilcox Letter and Newspaper Articles

The Court need not address Defendant's arguments that the resignation letter from Dr. Wilcox and the newspaper articles are inadmissible because it does not consider either exhibit in its summary judgment analysis (see Doc. 172 at 7).

## V.  PLRA Physical Injury Requirement

Defendant argues that Plaintiff's claim is barred because he cannot demonstrate that he suffered a physical injury, which, according to Defendant, is required under § 1997e(e) the PLRA (Doc. 172 at 3-4).[7] Defendant's reliance on out-of-circuit case law to support this argument is misplaced because the Ninth Circuit has expressly held that even absent physical injury, a prisoner is entitled to seek compensatory, nominal, and punitive damages premised on violations of his constitutional rights. Oliver v. Keller, 289 F.3d 623, 629-30 (9th Cir. 2002). In his Complaint, Plaintiff specifically sought compensatory and punitive damages for violations of his Fourteenth and Eighth Amendment rights (Doc. 1 at 4, 7). Therefore, his claim is not barred by § 1997e(e).

## VI.  Medical Care-Policy Claim

To succeed on his claim against Defendant, Plaintiff must show that "action pursuant to official municipal policy" caused his injury. Monell, 436 U.S. at 691. The elements necessary to support a § 1983 claim against a municipality are: (1) the plaintiff was deprived a constitutional right; (2) the municipality had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1110-11 (9th Cir. 2001).

### A.  Deprivation of a Constitutional Right

#### 1. Standard Governing Medical Care

At the relevant time, Plaintiff was a pretrial detainee. Pretrial detainees are protected

---

[7] Section 1997e(e) provides "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."

- 10 -

by the Fourteenth Amendment's Due Process Clause, which provides that "detainees have a right against jail conditions or restrictions that 'amount to punishment.'" Pierce v. County of Orange, 526 F.3d 1190, 1205 (9th Cir. 2008) (citing Bell v. Wolfish, 441 U.S. 520, 535-57 (1979)). The Fourteenth Amendment standard is more protective than the Eighth Amendment standard, however, the Ninth Circuit has held that pretrial detainees' rights under the Fourteenth Amendment are nonetheless comparable to prisoners' rights under the Eighth Amendment. See Pierce, 526 F.3d at 1205; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986) ("the eighth amendment guarantees provide a minimum standard of care for determining [the plaintiff's] rights as a pretrial detainee, including his right to medical care").

To support an Eighth Amendment claim based on medical treatment, an inmate must demonstrate deliberate indifference. Estelle v. Gamble, 429 U.S. 97, 104 (1976). This analysis includes an objective prong and a subjective prong. First, an inmate must show a "serious medical need." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). A "'serious' medical need exists if the failure to treat an inmate's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (citation omitted).

Second, an inmate must show that the defendant's response to that need was deliberately indifferent. Jett, 439 F.3d at 1096. The deliberate-indifference prong is met if the inmate demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference. Id.

### 2. Analysis

In its Renewed Motion for Summary Judgment, Defendant does not directly address the two prongs in the deliberate-indifference analysis. Instead, Defendant acknowledges that there is evidence of possible "inadvertent delays" in medical treatment that might support a negligence claim against an individual provider but maintains that Plaintiff has failed to satisfy his "burden at each step of the" Monell analysis (Doc. 142 at 4).

- 11 -

Plaintiff submits evidence supporting that both his respiratory infection and high blood pressure conditions constituted serious medical needs (Doc. 169, Pl. Aff. ¶¶ 1-3, 6, 9, 20 (Doc. 169 at 11-12, 14)[8]). As Plaintiff notes, the Court previously determined that his conditions met this first prong of the deliberate-indifferent analysis, and, absent any evidence or dispute from Defendant, that finding does not change (see Doc. 52 at 11-12).

With respect to the second prong—whether the responses to Plaintiff's serious medical needs were deliberately indifferent—Plaintiff presents the following facts:

Plaintiff developed a serious respiratory infection; his throat was almost closed, he was barely able to eat or swallow, and he began losing weight (Doc. 169, Pl. Aff. ¶ 9 (Doc. 169 at 12)). On December 3, 2005, he submitted an inmate grievance stating that since August 2005, he had been trying to see a doctor and had already submitted three sick-call lists (or requests) seeking treatment but had not yet been seen (Doc. 1 at 4). See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (courts must consider as evidence in opposition to summary judgment the plaintiff's contentions in pleadings if those contentions are attested to under penalty of perjury, are based on personal knowledge, and set forth facts that would be admissible in evidence). The grievance also stated that Plaintiff was now coughing up green sputum with a mixture of blood (Doc. 1 at 4). On December 13, 2005, CHS responded to his inmate grievance by informing him that he was on the sick call list and reminding him that he had been given the "Cold Handout Sheet" in response to one of his requests for medical treatment (id.). The "Cold Handout Sheet" advises inmates how to make themselves feel better if they have a cold and includes a highlighted "Warning" that if symptoms last for more than 10-14 days or the inmate coughs up green or bloody sputum or neck glands become swollen, to submit a Medical Request (Doc. 168, Ex. G (Doc. 168 at 64)). Plaintiff appealed his grievance and wrote in his appeal that "medical keeps telling me that I am on sick call since August. I have never been seen," and he noted that he has the same symptoms for which the Handout Sheet warns inmates to submit a medical request (Doc. 1 at 4A).

---

[8]The second citation refers to the relevant page number in the Court's Case Management/Electronic Case Filing system.

Plaintiff was seen on January 24, 2006 (id. at 4B).  Plaintiff alleges that going 9-10 weeks without any treatment caused him significant weight loss and suffering from headaches, ringing ears, and cold and cough symptoms (id. at 4; Doc. 169, Pl. Aff. ¶ 9 (Doc. 169 at 12)).

In its first Summary Judgment Order, the Court noted that Defendant failed to submit any admissible evidence to contradict these facts or demonstrate that Plaintiff was not harmed by the delay in treatment for his respiratory infection (Doc. 52 at 13-14).  And Defendant presents no evidence with its pending motion.

As to his high-blood pressure condition, Plaintiff avers that he has been on prescription medication for hypertension since his diagnosis in 1999 (Doc. 169, Pl. Aff. ¶¶ 1-3 (Doc. 169 at 11)).  He also avers that when he was admitted into the jail in August 2005, his hypertension condition was confirmed (id. ¶ 6).  Plaintiff states that on numerous occasions, the jail failed to provide his blood-pressure medications (id.).  On March 17, 2006, Plaintiff submitted an inmate grievance stating that he ordered his high-blood pressure medication in writing on March 1, 10, and 14, 2006, and he had verbally inquired about his medication at least 12 times; however, he has now been without his medication for 10 days (Doc. 1 at 4D).  Plaintiff ended up going 19 days without his blood-pressure medication after at least 20 requests for it (id. at 4E).  In late April 2006, Plaintiff went at least 8 days without his medication due to gaps in the provision of refills (id. at 4E-4F).  Plaintiff alleges that the delays in medication caused him to suffer high blood pressure, dizziness, and constant headaches (Doc. 1 at 4, 4H).

Again, Defendant did not previously, nor does it presently, submit any admissible evidence to contradict Plaintiff's alleged facts regarding delays in medication for his high blood pressure and the resulting harm (see Doc. 52 at 12-13).

On this record, the Court finds genuine issues of material facts whether Plaintiff was deprived of his constitutional right to adequate medical care with regard to his respiratory infection and high blood pressure, thereby satisfying the first element needed to support his Monell claim.

**B.     Existence of Policy or Custom**

- 13 -

1  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).  Thus, an unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" policy.  Monell, 436 U.S. at 691.

As to this second element, Defendant relies on the option in Celotex that allows for the movant's initial burden of production to be discharged by directing the court's attention to the absence of evidence supporting the nonmovant's case (Doc. 142 at 3-5). See Celotex, 477 U.S. at 325.  To discharge its initial burden, a movant must "point to shortfalls in the [plaintiff's] case to demonstrate the absence of evidence . . . ."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1543 (9th Cir. 1989); see Celotex, 477 U.S. at 332 (Brennan, J., dissenting) (a conclusory assertion that the nonmovant lacks any evidence is insufficient; the movant must affirmatively demonstrate that there is no evidence in the record).

Here, Defendant relies solely on the Court' prior determination that there was no evidence to demonstrate a policy of denying medical care at the jail (Doc. 142 at 4-5, citing Doc. 116 at 10).  Defendant contends that because the evidentiary record is the same now as when the previous Summary Judgment Order was entered, there is no basis for finding the existence of a policy (Doc.142 at 4-5).

But the evidentiary record is not the same; it now includes evidence Plaintiff submitted in response to Defendant's pending motion.  That evidence includes Dr. Wilcox's testimony, in which he establishes that he worked at the jail for four years—as a consultant and then medical director for the Maricopa County Jail System from 2004 to February 2006, and as a consulting assistant to the CHS Director and a treating physician from 2006 to February 2008 (Doc. 167, Ex. B, Wilcox Dep. 32:6-23, 39:24-40:4).  During these four years, he had the opportunity to observe the health care provided at the jails (id. 38:20-39:16, 64:7-24).

1  Dr. Wilcox testified that he observed problems with inmate access to health care, including the lack of a triage program at the jail, which he stated was essential for identifying the patients requesting care who are sicker and need to see providers as soon as possible:

> Prisoners would submit a sick call request and that sick call request was not triaged as I would consider it in the system, . . . . What you would see on a sick call request, and I saw this on one after another after another, is the nurse would write in the response section "scheduled," and so they would add them to the list to be seen, but there was no sense of how quickly that needed to happen (id. 75:5-14, 78:2-12).

Dr. Wilcox stated that as a result of this system, many chronically ill patients "end up being placed on a list and they don't get seen in a timely fashion" (id. 79:17-21). He confirmed that while he was at CHS, he saw individuals who had to be admitted to a hospital because they hadn't receive sufficient care prior to their condition becoming an emergency; "many times you will find that they have submitted numerous sick call requests. They have not been seen. They finally kind of reach a point at which its an emergency" (id. 94:10-95:2). Dr. Wilcox also testified that he was frustrated by how CHS "developed their sick call requests and they determined who was going to be seen by the provider not based on acuity, but based on housing locations"; they simply picked a certain housing location and saw "however many" inmates in that location for that day (id. 78:19-25).

As to the provision of medications at the jail, Dr. Wilcox testified that he frequently saw medications that were ordered not get to the patient: "it's a fairly common occurrence within CHS to have glitches in the medication process. It's very common to have patients who have medications ordered and they are not receiving those medications" (id. 106:18-107:2).

The above evidence demonstrates more than isolated incidents of denied care; rather, it suggests that the jail regularly failed to provide adequate and timely medical care to its detainees. See Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-04 (1997); Trevino, 99 F.3d at 918. The Court finds that Plaintiff sufficiently establishes a disputed material fact whether, during his confinement at the jail, there was a ongoing policy or custom of denying and/or delaying medical care to detainees who submitted sick call

- 15 -

requests, as well as a policy or custom of failing to timely provide inmates with prescribed medications. See Gibson v. County of Washoe, 290 F.3d 1175, 1194-95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### C.     Policy or Custom that Amounts to Deliberate Indifference

Because deliberate indifference is exhibited where jail officials deny or delay medical treatment and harm results, see Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990), and Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989), an ongoing policy or practice that delays treatment or medication for serious medical needs and thereby causes injury would constitute a deliberately-indifferent policy.

Moreover, Plaintiff submits evidence showing that Defendant had the requisite knowledge of deficient policies or practices governing health care at the jail but chose not to correct those deficiencies. Dr. Wilcox explained that he began working with the Maricopa County Jail in November 2004 as a consultant with Phase 2 Consulting, which provided consulting and management services for correctional health care (Doc. 167, Wilcox Dep. 30:6-10, 32:6-11, 33:1-18). Once the Phase 2 Consulting contract was in place, Dr. Wilcox was hired as the medical director at the beginning of December 2004 (Doc. 167, Wilcox Dep. 35:23-36:3). According to Dr. Wilcox, the county was unwilling to implement recommendations made by Phase 2 Consulting (id. 131:25-136:122:2). He states that when Phase 2 came in:

> [W]e made a number of significant recommendations to the County about restructuring the health care delivery process to try to address some of the problems, . . . . And there was a real consistent pattern that we even joked about . . . we would make recommendations to the County, [but CHS operational director] Sandi Wilson, [ ] would promptly say no . . . and the recommendations would not be implemented. There were a number of those that [] just made it impossible to move the system ahead because we couldn't lay down those core foundational changes that needed to occur (id. 122:3-123:5).

Dr. Wilcox also explains that the NCCHC, a non-profit organization that has established an accreditation process and a set of standards that correctional facilities may participate in, conducted an audit of the jail in December 2005 (id. 44:24-45:6, 45:20-22, 46:23-47:4). Dr. Wilcox was at the jail when the audit survey was performed, the NCCHC

interviewed him as part of the audit, and he reviewed the February 2006 NCCHC accreditation report (id. 55:19-56:12, 57:18-20). He confirms that following that audit, the NCCHC accreditation committee voted to place the jail on probation (id. 58:11-15). The inference from this evidence is that placement on probationary status would have put Defendant on notice of deficiencies with health care at the jail.[9] See Anderson, 477 U.S. at 255 (all inferences drawn in nonmovant's favor).

Finally, Dr. Wilcox testified that with respect to addressing the needs of CHS patients, having been a part of management within CHS, he knows that upper management was "well informed about the issues and challenges" (Doc. 168, Ex. B, Wilcox Dep. 213:18-24).

The above evidence raises a genuine issue of material fact whether the on-going policies or customs governing access to medical care and the provision of prescribed medication amounted to deliberate indifference.

### D.   Moving Force Behind Violation

To establish that the policy or custom is the "moving force" behind the constitutional violation, Plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. See Brown, 520 U.S. at 404. He must show that had the policy or practice been different, the injury would have been avoided. Gibson, 290 F.3d at 1196 (citing Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir. 1992)).

If a policy or custom is found to have a known or obvious consequence of infringing on federally protected rights, it is difficult to see how such a policy is not also the "moving force" behind the known or obvious harms. See Brown, 520 U.S. at 405 ("the conclusion that the action taken or directed by the municipality . . . itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains"). Plaintiff has already established a genuine issue of material fact

---

[9]Defendant incorrectly asserts that the Court already considered the NCCHC report in its prior Summary Judgment Order (Doc. 142 at 5). The report was not a part of the record when the prior Order was issued, nor is a copy of the report submitted with the current summary-judgment briefing. Thus, the Court considers only Dr. Wilcox's undisputed testimony that the report stemmed from a December 2005 audit and that after the report was issued, the jail was placed on probationary status.

whether there existed at the jail a policy or custom of delaying health care and prescribed medications for serious medical needs. The Court finds that an obvious consequence of such a policy or custom may be the denial of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied.

Plaintiff's evidence is otherwise sufficient to support a direct link between a policy or custom of delaying health care and his alleged injuries. Plaintiff's allegations that he submitted numerous sick call lists and was repeatedly told he was scheduled but, nonetheless, was never seen by medical, are in accordance with procedures that Dr. Wilcox testified he observed time and again with regard to sick call requests (see Doc. 167, Wilcox Dep. 75:5-14, 78:2-12, 79:17-21). Likewise, Plaintiff's allegations that he did not timely receive his prescribed high blood-pressure medication correlate directly to evidence that it was a "very common" practice at the jail for medications to be ordered but then not actually provided to inmates (see id. 106:18-107:2). It follows that if these procedures and practices were different, Plaintiff would have been provided timely medical care for his respiratory infection and medication for his high blood pressure and not suffered a deprivation of his constitutional rights. See Gibson, 290 F.3d at 1196. As such, a material factual dispute exists whether the jail's policies or customs were the moving force behind the alleged violations.

In sum, there are genuine issues of material fact as to whether Defendant was deliberately indifferent to the risk that its policies and customs governing access to medical care and medications would violate inmates' right to constitutionally adequate medical treatment. Defendant's Renewed Motion for Summary Judgment will therefore be denied.

**IT IS ORDERED that** Defendant's Renewed Motion for Summary Judgment (Doc. 142) is **denied**.

DATED this 5th day of November, 2012.

_____
Robert C. Broomfield
Senior United States District Judge